THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v KEVIN ANDERSON, Appellant. [921 NYS2d 156]—

Appeal by the defendant from a judgment of the Supreme Court, Queens County (Hanophy, J.), rendered September 12, 2008, convicting him of murder in the second degree and criminal possession of a weapon in the second degree, upon a jury verdict, and imposing sentence.

Ordered that the judgment is reversed, as a matter of discretion in the interest of justice, and a new trial is ordered.

During the early morning hours of September 19, 2004, the victim was shot to death outside of a party being held at an apartment in Queens. Six days after the shooting, a 17-year-old who had attended the party identified the defendant from a lineup as the man he had seen engage in a lengthy argument with the victim and later shoot him. When questioned by the police, the defendant, who had been the victim's close friend, initially denied that he had attended the party. Although the de-

fendant later admitted that he had been present, he claimed that the victim had argued with two other men, and that these unidentified men then left the party. According to the defendant, after these two men returned to the party, people suddenly began running out of the apartment, and the defendant heard a gunshot. Other guests then told the defendant that the victim had been shot.

At a jury trial conducted over three years after the shooting, the primary prosecution witness was the young man who had identified the defendant as the shooter. The eyewitness admitted that in the intervening years, he had been arrested on gun and marijuana possession charges, and that he had signed an agreement with the Queens County District Attorney's Office offering to provide information about the homicide in the hope of receiving a more favorable disposition of the charges against him. The gun possession charge against the eyewitness was ultimately dismissed, and he pleaded guilty to marijuana possession. However, a Deputy Executive Assistant District Attorney testified that his office had not actually given the eyewitness a plea agreement in exchange for information about the homicide, and that he had moved for dismissal of the gun charge solely because he lacked confidence that this charge could be sustained. The defendant also took the stand in his own behalf, and gave testimony suggesting, in accordance with his statements to the police, that the victim had been shot by one of the unidentified men he had argued with earlier in the evening. At the conclusion of the trial, the jury returned a verdict convicting the defendant of murder in the second degree and criminal possession of a weapon in the second degree.

On appeal, the defendant contends that he was deprived of a fair trial by both his cross-examination by the prosecutor, and by certain improper and prejudicial comments made by the prosecutor during summation. Although the defendant's objections were not preserved for appellate review, we review them in the exercise of our interest of justice jurisdiction (see CPL 470.15 [6] [a]), and conclude that the cumulative effect of the prosecutor's misconduct during cross-examination and on summation deprived the defendant of a fair trial.

The trial court's *Sandoval* ruling (see *People v Sandoval*, 34 NY2d 371 [1974]) permitted the prosecutor to inquire into the underlying facts of the defendant's prior narcotics conviction arising from a June 2002 drug sale. However, rather than confining his inquiry to the facts relevant to show that the defendant placed his own interest above that of society by selling narcotics to an undercover police officer in June 2002, the

prosecutor asked a series of irrelevant and prejudicial questions concerning how the drugs were packaged, the source of the drugs, the name of the defendant's supplier, where the supplier lived, what the supplier looked like, and what financial arrangements the defendant had with his supplier. The prosecutor's repeated and extensive questioning regarding the details of the June 2002 sale exceeded the proper scope of the *Sandoval* ruling, and "were clearly intended to show the defendant's criminal propensity, and, as such, were improper" (*People v Hill*, 193 AD2d 619, 619 [1993]; *see People v Wright*, 41 NY2d 172, 175 [1976]; *People v James*, 218 AD2d 709, 710 [1995]; *People v Gunther*, 175 AD2d 262, 264 [1991]). Moreover, while the *Sandoval* ruling also permitted the prosecutor to inquire about the fact that the defendant had three other drug convictions, in the course of cross-examining him about the existence of these convictions, the prosecutor repeatedly demanded that the defendant acknowledge choosing to do "what's best for [the defendant]" instead of choosing to abide by the law, thus inviting the jurors to focus their attention on the defendant's propensity for criminal conduct.

Furthermore, although a prosecutor should not support his or her case by his or her own or anyone else's "veracity and position" (*People v Lovello*, 1 NY2d 436, 439 [1956]; *see People v Moye*, 12 NY3d 743, 744 [2009]), the prosecutor did so here by effectively vouching on summation for the conduct and credibility of two witnesses based upon their positions. First, in discussing the testimony of a former Assistant District Attorney who was present at the lineup identification procedure, the prosecutor emphasized that this individual was now a New York City Councilman, and commented that the councilman was at the lineup to make sure that it was fair, and that the right person was identified. Second, in highlighting the testimony of the Deputy Executive Assistant District Attorney who denied that the information provided by the eyewitness played a role in the dismissal of a gun possession charge against him, the prosecutor focused on this individual's high-level position in the District Attorney's Office of a "county of millions," and stressed that his credentials included "lectures about ethical considerations of prosecutors."

On summation, the prosecutor also exceeded the bounds of permissible advocacy and improperly denigrated the defense by likening the defendant's testimony to a "script" composed of "[r]ehearsed line[s]," calling the defendant's explanation for why he initially denied attending the party a "[b]old-face[d] lie," and making other comments suggesting that the defendant

was lying (*see People v Gordon,* 50 AD3d 821, 822 [2008]; *People v Brown,* 26 AD3d 392, 393 [2006]; *People v Pagan,* 2 AD3d 879, 880 [2003]; *People v Russell,* 307 AD2d 385, 387 [2003]; *People v Skinner,* 298 AD2d 625, 626-627 [2002]; *People v Walters,* 251 AD2d 433, 434 [1998]). The prosecutor additionally mischaracterized the defendant's testimony by claiming that the defendant went home to sleep after learning of his friend's death, in order to support an unnecessarily inflammatory argument that the defendant was as remorseless as a hunter who kills a deer (*see People v Anderson,* 35 AD3d 871, 872 [2006]; *People v Walters,* 251 AD2d at 434).

Since it cannot be said that there is no significant probability that the verdict would have been different absent the cumulative prejudicial effect of these errors, we cannot deem them harmless (*see People v Grant,* 7 NY3d 421, 424 [2006]; *People v Crimmins,* 36 NY2d 230, 241-242 [1975]; *People v Slide,* 76 AD3d 1106, 1110-1111 [2010]; *People v Gibian,* 76 AD3d 583, 589 [2010]). Covello, J.P., Florio, Eng and Chambers, JJ., concur.